# UNITED STATES DISTRICT COURT

NORTHERN     DISTRICT OF     ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

**F I L E D**

UNDER SEAL

MAGISTRATE JUDGE MASON

v.

VICTOR BROWN

MAY - 7 2010

MAY 7 2010

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**CRIMINAL COMPLAINT**

**10 CR 0378**

CASE NUMBER:

10 CR 378

I, Special Agent Craig Henderson, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

On or about February 18, 2010, at Chicago, in the Northern District of Illinois, Eastern Division, defendant herein:

> did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the Federal Bureau of Investigation and the United States Department of Justice, agencies within the executive branch of the Government of the United States, in that BROWN stated 1) he did not accept money from a police officer in return for influencing people at or associated with the Chicago Police Board; 2) he did not ever suggest to anyone that he could have a separation or disciplinary case fixed at the Chicago Police Board; 3) he did not ever tell anyone that he had a contact or contacts at the Chicago Police Board; and 4) he never told anyone that for $15,000, or $12,500, $10,000 or $7,500, his people could take care of things at the Chicago Police Board;

in violation of Title 18 United States Code, Section 1001.

I further state that I am a Special Agent of the Federal Bureau of Investigation and that this complaint is based on the following facts:

**See attached affidavit**

Continued on the attached sheet and made a part hereof: __X__ Yes __ No.

Signature of Complainant

Sworn to before me and subscribed in my presence,

May 7, 2010     at
Date

Chicago, Illinois
City and State

Michael T. Mason, U.S. MAGISTRATE JUDGE
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT

I, CRAIG HENDERSON, being duly sworn, deposes and states as follows:

1.      I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") for nearly sixteen years, having been assigned to the Chicago Division for twelve and a half years, and the FBI Laboratory Division for three and a half years.  While assigned to the Chicago Division, I have been part of an Organized Crime Squad and a White Collar Crime/ Public Corruption squad, and have investigated violations of federal statutes, including wire fraud, mail fraud, money laundering and extortion.

2.      I am familiar with the facts and information contained in this affidavit, which is based on my own personal observations, witness interviews, review of consensually recorded conversations, analysis and review of documents and records, and from discussions with other FBI Special Agents and investigators from the Chicago Police Department ("CPD") Internal Affairs Division ("IAD").

3.      This affidavit is made in support of a criminal complaint charging VICTOR BROWN ("BROWN"), with a violation of 18 U.S.C. Section 1001(a)(2), charging that, on February 18, 2010, BROWN did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI") and the United States Department of Justice, agencies within the executive branch of the Government of the United States.

4.      Since this affidavit is being submitted for the limited purpose of

1

establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe BROWN committed a violation of 18 U.S.C. Section 1001(a)(2).

## I.   BACKGROUND

5.   The FBI is investigating allegations that VICTOR L. BROWN solicited bribes from CPD officers in exchange for arranging to fix disciplinary cases for those officers before the Chicago Police Board (the "Police Board"). During this investigation, the FBI developed a confidential source ("CS") who was subject to discipline by CPD and had been assigned to the CPD Alternate Response Unit at the time that he/she met BROWN. The CS permitted agents to consensually record calls on his/her telephone and also wore a recording device to record conversations with BROWN in person.

6.   CPD officers who are subject to disciplinary proceedings may appeal a recommendation of serious discipline to the Police Board. The Police Board is comprised of nine individuals who are not members of the CPD. During the course of the investigation, agents developed information indicating that BROWN took bribes in return for his promise of a favorable result for officers' disciplinary cases before the Police Board.

## II.   BROWN SOLICITS AND ACCEPTS BRIBES FROM THE CS

### A.   Information Provided by the Confidential Source

7.   The CS was indicted in the course of an investigation involving mail

2

fraud occurring in the Chicago, Illinois area. The CS agreed to assist in an ongoing criminal investigation in exchange for a reduced charge in his/her case, to which he/she has plead guilty pursuant to a plea agreement.

8.    As part of his/her cooperation, the CS consented to the interception and recording of all calls made to and from the CS's cellular telephone.[1] At times material to this affidavit, the CS was assigned to the Alternate Response Section of the CPD. According to the CS, on September 15, 2008, while BROWN and the CS were working at the Alternate Response Section, BROWN approached the CS and said he was aware of the CS's situation. According to the CS, the following conversation occurred on that day. BROWN offered to arrange a favorable outcome for the CS's case at the Police Board in exchange for a cash payment. BROWN proposed that the CS would pay BROWN $10,000 in order to fix the CS's case. This conversation was not recorded. According to the CS, he/she did not know BROWN prior to being assigned to the Alternate Response Section.

**B.    BROWN Takes Bribes from the CS**

9.    On September 17, 2008, the CS met BROWN at a restaurant for the

---

[1] While other law enforcement agents and I have listened to consensually recorded conversations of telephone calls and meetings and have attempted to transcribe them accurately, to the extent quotations from these conversations are included, these are preliminary, and not final, transcriptions. Based on my training and experience, the context and content of the conversations, and in the context of this investigation, I have included bracketed explanations where appropriate to explain my understanding of these conversations, including coded language and terms used. Finally the summaries below do not include all potentially criminal conversations that have occurred during this investigation or all statements or topics covered during the course of the recorded conversations described below.

purposes of paying him a bribe payment of $500 in exchange for BROWN's efforts to fix the CS's Police Board disciplinary proceeding. This meeting was consensually recorded by the CS. Prior to the meeting, the CS was provided with $500 in prerecorded funds. The CS was fitted with an audio-recording device and the CS and his/her vehicle were searched for the presence of any excess currency, with negative results. At approximately 2:10 p.m., surveillance observed BROWN entering the meet location, 1000 W. Washington, by himself. BROWN and the CS then met together out of view of surveillance. According to audio surveillance, at approximately 3:12 p.m., the CS handed BROWN the bribe payment which was placed inside of a newspaper. The CS can be heard on the recording telling BROWN, "Check page four, I found a cool article on page four." After the meeting the CS was surveilled until he/she met with agents and the CS and his/her vehicle were searched for the presence of excess currency with negative results.

10. The CS was debriefed after the meeting and related he/she paid BROWN the $500 bribe payment towards the end of the conversation between BROWN and CS. CS further stated that CS placed the $500 in page 4 of the newspaper before he/she gave it to BROWN. CS also stated he/she told BROWN to turn to page 4 of the paper because that is where he/she placed the $500.

11. On September 25, 2008, during a consensually recorded meeting, the CS met with BROWN and paid BROWN $1,000 with funds provided by the FBI. Prior to the meeting, the CS was provided with $1,000 in pre-recorded funds. The CS was fitted with an audio and video recording device and the CS and his/her

vehicle were searched for the presence of any excess currency, with negative results. The payment was audio and video recorded. Investigators conducted surveillance of the meeting and observed BROWN's vehicle in front of the location where the meeting with the CS was to take place. BROWN and the CS were observed leaving the meet location and walking around the block in the area of the meeting. During the meeting, at approximately 12:00 p.m., video shows the CS handing BROWN the bribe payment of $1000. On the audio recording, BROWN expressed disgust with the small payment and stated "it looks like you're up to something," and demanded an additional $3,500 by October 2, 2008. After the meeting, the CS and the CS's vehicle were searched for the presence of excess currency with negative results.

### C.    BROWN Demands Additional Bribe Payments from the CS

12.    On October 2, 2008, at approximately 9:36 a.m., during a consensually recorded conversation,[2] BROWN told the CS "I'm going to tell em [Police Board member(s)], you showed up and you [CS] said you ain't got nothing today [the CS did not provide a payment today], and then they gonna do whatever they do." BROWN stated, "I keep telling you, you don't run how they do stuff, they do it." BROWN told CS, "You made promises you don't keep." BROWN then told CS,

---

[2]   I have listened to the voices on the recorded conversations set forth in this affidavit. I can identify the voice of the CS because I met with him/her numerous times during this investigation. I can identify the voice of BROWN because I conducted the interview of BROWN for over an hour on February 18, 2010. I also observed BROWN on surveillance on several occasions when the CS met with BROWN to make bribe payments to BROWN and recorded conversations during those meetings with BROWN. Based on these observations of BROWN and his voice, I believe that all of the statements set forth in this affidavit which are ascribed to BROWN were in fact made by VICTOR BROWN.

"When you dealin' with big people, I'm tellin' you if you don't keep your word, you can forget it [CS is creating a problem by not paying promptly]."

13.     On October 3, 2008, at approximately 9:13 a.m., during a consensually recorded conversation, BROWN told CS, "You got to have fifteen hundred to them today [a $1500 bribe payment] and they said, ain't no waitin' a year. The Department can move on you whenever [meaning the CS's Police Board case could move forward at any time]." The CS and BROWN spoke about an officer who appealed to the Police Board and BROWN emphasized the serious consequences by telling the CS that, "When someone goes up against the Police Board, you don't get a check [referring to the fact that the officer before the Board would be in a non-pay status until the matter is resolved by the Board]. When you go up against the [Police] Board, they are trying to separate [fire] you from the Police Department."

14.     On October 3, 2008, at approximately 9:36 a.m., during a consensually recorded conversation BROWN told the CS, "They got your stuff [money from CS's bribe payment], I don't do no talkin' on the phone." After the CS said that he/she would like a receipt for the money he/she paid, BROWN responded, "Who in the fuck gonna give you a motherfuckin' receipt for some shit they doin', they ain't supposed to [no one would provide a receipt for illegal payments they accepted]?"

15.     On October 13, 2008, at approximately 6:30 a.m.,during a consensually recorded conversation BROWN asked the CS what he/she was going to do and the CS replied that he/she could get some money at the end of the week. BROWN stated that he wanted to meet earlier in the morning, saying, "We need to start

being earlier than that, man, and I'm gonna tell you something. I gotta call you when I call you, we can't do too much talkin' cause some stuff got passed around that I won't even speak of on the phone [meaning BROWN does not want to talk on the phone because people are talking about a possible investigation]." BROWN told CS, "People been talkin', and there's been too much talkin'. There's been some talkin', rumors goin' around, there's too much talkin'."

16. On October 23, 2008 at approximately 9:11a.m., during a consensually recorded conversation, the CS told BROWN that the CS would "have twenty-five hundred for you on Monday." BROWN replied, "After that, you should be straight until you finish your court stuff [meaning that the amount paid would satisfy the Board until the CS's pending federal court case was resolved]." The CS asked BROWN to, "Get a hold of whoever your guy is over there at IA [CPD Internal Affairs] and find out what's going on with my case [meaning find out the status of the CS's case in CPD's disciplinary proceeding process]." BROWN replied, "Alright."

17. On October 23, 2008, at approximately 9:23 a.m., during a consensually recorded conversation, BROWN asked the CS if the CS was "gonna have the two-five [$2,500] on Monday?" The CS replied, "Yeah, twenty-five hundred." BROWN then told the CS that "would put you at five [$5,000 in total paid to BROWN for the bribe]." BROWN also stated that, as long as, "your court stuff don't mess up [as long as the CS is able to plead to a misdemeanor charge in his/her criminal case, rather than a felony] and then you straight."

18.     On October 26, 2008, at approximately 6:36 p.m.,during a consensually recorded conversation, BROWN asked, "You said you gonna have two-five [$2500] right? Cause that's what I told them." The CS answered, "Yeah, twenty-five hundred." BROWN then told the CS, "After that, he said you'd be straight." BROWN then told the CS that BROWN talked to somebody and "they holding off on your stuff 'til your, uh your court stuff over [they are waiting to resolve CS's Police Board case until after they ensure that CS pleads to a misdemeanor in the criminal case]."

19.     On October 27, 2008, at approximately 11:18 a.m., surveillance observed a meeting between BROWN and the CS in the area of Central Avenue and Milwaukee Avenue, Chicago, Illinois. The purpose of the meeting was for the CS to pay a $2,500 bribe to BROWN. Prior to the meeting, the CS was provided with $2,500 in prerecorded funds. The CS was fitted with an audio and video recording device and the CS and his/her vehicle were searched for the presence of any excess currency, with negative results. Surveillance observed the CS reach into his/her shirt pocket, remove the twenty-five hundred dollars and place it into a newspaper. Surveillance then observed BROWN take the newspaper, shake the CS's hand, and enter his vehicle. BROWN's vehicle left the area at a high rate of speed. After the meeting, the CS and the CS's vehicle were searched for the presence of excess currency with negative results. The CS was debriefed and stated that toward the ending of the meeting with BROWN, CS removed the bribe payment, $2,500, from his/her left front shirt pocket and placed it into a newspaper. According to the CS,

he/she then handed the newspaper to BROWN.

20.     On October 27, 2008, at approximately 12:25 p.m., during a consensually recorded conversation, BROWN and the CS discussed the status of the CS's CPD IAD investigation. BROWN told the CS, "To answer your question, they said within ninety days." The CS asked, "What's in ninety days?" BROWN told the CS, "When you finish your court stuff, within ninety days." BROWN told the CS that the CS's CPD IAD investigation had not been assigned to "somebody yet because they overloaded. They haven't gave it to nobody yet, is what they told me."

21.     On October 27, 2008, at approximately 12:30 p.m., during a consensually recorded conversation, BROWN told the CS, "Hey I was told it [CS's investigation file] wasn't assigned to nobody, but they can check on that or whatever." BROWN also advised the CS that his/her CPD IAD statement should be "short and sweet" because the CS would have already entered a guilty plea on misdemeanor charges in court. BROWN then told the CS "everything going to be fine" to "just relax, everything be cool."

22.     On October 29, 2008, at approximately 8:15 a.m., during a consensually recorded conversation, BROWN told the CS, "They [BROWN's contacts at the Police Board] said, '[CS is] sure?' [Meaning they were asking whether the CS was serious about going through with fixing his/her case before the Police Board.] I [BROWN] said, 'The man emphatic. [CS] said [CS] knows [CS's] getting a misdemeanor in court [referring to the resolution of the CS's criminal case]. [CS] ain't worried about the court, all [CS's] worried about is the Department and if something happens to

9

[CS], [CS's] gonna get [CS], keep [CS's] job.' I told them [BROWN's contacts] everything you said, that's what they said." BROWN then told the CS, "You don't have anything to worry about. If you decide you want to tip [pay additional amounts toward the bribe] them or something when all your shit over, that's up to you." BROWN then advised the CS that BROWN talked to them so the CS would not have to pay an "extra grand." The CS then asked BROWN what would happen after the administrative portion of the IAD investigation was over. BROWN replied to the CS, "What they want you to know, mainly, is that, you straight [meaning CS's case will have a favorable outcome for CS]." BROWN further stated to the CS, "You gonna, you'll keep your job." Later on in the conversation BROWN explained the Police Board to the CS, stating, "I don't know if you know how the Board works and stuff, you have to have a majority decision if you go to the Board." BROWN further told the CS, "They allocate the things to where you have a majority ruling. Majority means you got nine members on there. All nine, all nine don't show up every month." BROWN told the CS that members of the Police Board talk to each other about the cases, saying, "They know how they're gonna do certain things with certain people." The CS asked BROWN how the "tipping" worked and how many people should he/she "tip?" BROWN explained that the "tipping" part was all up to the CS and was optional.

23.    On November 4, 2008, at 9:52 a.m., during a consensually recorded conversation, the CS told BROWN that he/she did not have any money last week and asked BROWN what he/she owed. BROWN told the CS, "Well you know you

gotta have the twenty-five [$2,500] now cause they said fifteen by Friday." The CS then asked BROWN when he/she needed to pay the "twenty-five" and BROWN responded "ASAP." BROWN then asked the CS when he/she would have the money. The CS told BROWN he/she needed to get the money together. BROWN replied to the CS that the CS did not have to pay it all at once if it is "easier to get part than all." The CS then told BROWN he/she will see how much he/she can raise in a week.

24.     On November 4, 2008, at approximately 11:01 a.m., during a consensually recorded conversation, BROWN told the CS that BROWN, "Just talked to one of them. They said try and do the best you can and try and see if you can get something [an additional cash payment] in at the end of this week." The CS replied, "Okay" to which BROWN responded, "I'm just passing that on to you what they told me."

25.     On March 17, 2009, at approximately 2:05 a.m., BROWN and the CS had a conversation at the CPD Alternate Response Section. The conversation was consensually recorded by the CS. BROWN said to the CS, "You said you was gonna pay [make a bribe payment], I can't make you. We doin too much talkin. I don't know whose what. Somebody mentioned some shit about the Board and IAD, it was a confidential source [BROWN was concerned that people are talking about there being a confidential source providing information about the Police Board]. I need to know what you gonna do about the money?" The CS replied, "I'm gonna get you some money this week." BROWN said, "This is my Friday. You come here, you can

11

give me a newspaper, we can go in the bathroom, you can say here's a comic book [meaning the CS can hide a bribe payment in a newspaper or magazine as they had done in the past]. You can do what ever. Just tell me what you want to do and do what you gotta do." Later in the conversation BROWN said, "They have moles here, they know a lot of shit. If you see me just go like we did that one time. Here's today's newspaper. Like we did that time in the restaurant [referring to the September 17, 2008 bribe payment set forth in paragraph 9 above]. If you have to say something write it down. Unless we are buck naked somewhere in a pool where you can see my nuts and I can see your nuts. You never know who is here." [BROWN is expressing concern about there being people listening in on his conversations with the CS and is telling the CS to be very careful in talking about and making bribe payments]. After a pause, Brown said, "So, you said Thursday." The CS replied, "Thursday [March 19]." BROWN asked, "What do you think you are going to try to do?" CS says, "I'm gonna get you at least five[$500]." BROWN replied, "Alright, cool."

26.     On March 19, 2009 at approximately 10:34 p.m., surveillance observed a meeting between BROWN and the CS in the area of the Chicago Police Department's non-emergency call center at 2111 West Lexington, in Chicago, Illinois. The purpose of the meeting was for the CS to pay a $500 bribe to BROWN. Prior to the meeting, the CS was provided with $500 in prerecorded funds. The CS was fitted with an audio recording device. Surveillance observed BROWN driving a dark colored Chrysler Sebring when he arrived at the parking lot located at 2111

12

West Lexington. Surveillance observed BROWN exit his vehicle and approach the CS who was standing in the open passenger front door of the CS's vehicle, which was parked in the parking lot. According to surveillance and the CS, BROWN leaned in the driver's side window and the CS leaned in the open door and they had a conversation through the car. According to the CS, BROWN reached into the CS's vehicle as the CS handed BROWN the $500 bribe payment. The recording from the device worn by the CS contained the following conversation. BROWN asked, "You just got to work?" CS said "Yeah." BROWN said, "Put it in, it's cool. What is it?" CS responded, "Five [$500], alright." BROWN said, "Alright." CS asked, "Now, how much more we got [how much more does CS have to pay to complete the bribe]?" BROWN replied, "We'll talk."

27. On March 20, 2009, at approximately 5:40 p.m., during a consensually recorded conversation, BROWN said, "Alright, listen." The CS responded, "Yeah." BROWN continued, "They done messed up. You know how much you, you done paid already?" CS replied, "Um...was it, it would be..." BROWN asked, "Fifty five hundred [$5,500]?" CS responded, "Yeah. Fifty five hundred, ok." BROWN stated, "Fifty five hundred. But um, I'm just letting you know, fifty five hundred. You need two thousand [in addition to the $5,500 CS has already paid to BROWN]. I don't know what you got tonight, you need to try and get the most money you can to them. They [BROWN's contacts on the Chicago Police Board] was pissed off. I said, 'look, [the CS] been going through shit. I been going through my stuff. I wasn't at work [referring to BROWN's extended absence from work due to medical issues], so,

13

there's a couple times [ the CS] tried to give me, you know, [the CS's] shit together, whatever, and I wasn't there.' You need to, I don't know what you got, I don't know what you can get [as additional bribe payment money]. Need to get your shit together and then I'm gonna call this lawyer [to represent CS before the Police Board], or whatever, and put him on you, or whatever, and they can take your stuff from there, with your legal shit, but they [BROWN's contacts on the Chicago Police Board] want they stuff [additional bribe payment money]. And they, you know, like I said, you, you went through it how you went through it, however you had to go cause your other lawyer, and pay and whatever, that shit's behind you [referring to the CS's criminal case being resolved].' CS responded, "Alright." BROWN said, "I don't know what you got on you. You need to scoop up whatever, I could try and take them [BROWN's contacts on the Chicago Police Board] the rest of the more money tomorrow, cause I took it to them, like, man thought this dude was uh, I'm like, '[the CS] ain't did. [The CS, the CS], I been going through my stuff, [the CS] tried to meet me [BROWN] a couple times and I didn't, it was on me. I didn't meet [the CS] [meaning that BROWN is covering for the CS with BROWN's contacts on the Police Board and providing excuses as to why payments haven't been made].'" CS said, "Thank you! Thank you! I'm glad you, I'm glad you told him that."

### III.   BROWN MAKES MATERIAL FALSE STATEMENTS TO FBI AGENTS DURING A FEBRUARY 18, 2010 INTERVIEW

28.   On February 18, 2010, FBI agents went to BROWN's residence, knocked on the door and asked to speak with BROWN.  BROWN answered the door,

14

agreed to speak with agents, and invited them into his residence.

29.     During the interview FBI agents asked BROWN: "Did you ever ask for money from a Chicago police officer in return for influencing people at the Chicago Police Board?" BROWN answered no and stated that he had no influence with the Chicago Police Board.

30.     During the interview FBI agents asked BROWN: "Have you ever accepted money from a police officer in return for influencing people at/associated with the Chicago Police Board?" BROWN answered no and stated that he has no clout with the Chicago Police Board.

31.     During the interview FBI agents asked BROWN: "Have you ever suggested to anyone that you could have a separation or disciplinary case fixed at the Chicago Police Board?" BROWN was asked this question twice and both times he answered no, stating that he has no clout.

32.     During the interview FBI agents asked BROWN: "Have you told anyone that you have a contact or contacts at the Chicago Police Board?" BROWN answered no and again stated that he has no clout with the Police Board.

33.     During the interview FBI agents asked BROWN: "Have you ever told anyone that for $15,000 your people could take care of things at the Chicago Police Board?" This question was repeated substituting $12,500, $10,000 or $7,500 in place of $15,000. Each time the question was asked regardless of the amount of money referenced in the question, BROWN answered no. BROWN said he did not have clout on the Chicago Police Board. BROWN stated that he never offered a

15

monetary figure to anyone. BROWN stated that he told people what the lawyers charged, but never told anyone he could take care of things at the Chicago Police Board for a certain monetary figure.

## CONCLUSION

34.    Based on the foregoing, I believe there is probable cause to believe that VICTOR BROWN, violated 18 U.S.C. Section 1001, in that on February 18, 2010 BROWN did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI") and the United States Department of Justice, agencies within the executive branch of the Government of the United States.

_____
CRAIG HENDERSON
*Special Agent*
Federal Bureau of Investigation


SUBSCRIBED and SWORN before me
this 7th day of May, 2010.


_____
HONORABLE MICHAEL T. MASON
United States Magistrate Judge

16